Lucretia McGOWAN

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant.

No. 15978.

United States Court of Appeals
Third Circuit.

Argued Dec. 1, 1966.

Decided Jan. 30, 1967.

**40**

William T. Marsh, Pittsburgh, Pa. (Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellant.

John J. Hickton, Pittsburgh, Pa. (McArdle, Harrington, Feeney & McLaughlin, Pittsburgh, Pa., on the brief), for appellee.

Before SMITH, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

This is a diversity action governed by Pennsylvania law. Plaintiff-widow is the beneficiary of a life insurance policy issued by the defendant Prudential Insurance Company of America to her husband on July 11, 1956. Upon her husband's death the defendant paid the face value but refused to pay the accidental death and optional family income benefits because of a default in premium payments. Plaintiff obtained a jury verdict for such benefits on the submitted issue that defendant was estopped from raising the fact of non-payment. Defendant appeals.

Plaintiff and the insured knew defendant's agent Charles Wenk ("Wenk") as a neighbor when they lived in Chicago and he had successfully solicited policies from them. The policy in dispute was obtained through Wenk after the insured and plaintiff had moved to Pittsburgh.

The policy here involved is in the face amount of $10,000 with an accidental death benefit rider and an optional family income rider. These two riders are payable only if the stipulated premium payments are kept current. It did not have an automatic premium loan provision but it did have a loan value. When the policy was originally issued the premiums were payable annually. For the first two years (1956 and 1957) they were so paid through the Chicago agency of defendant where Wenk was employed.

On July 30, 1958, at the insured's written request, the premium payments were changed to a monthly basis, which came to $30.10. Each year thereafter the insured was issued a premium payment coupon book containing a separate coupon for each monthly payment which was to be mailed to the Pittsburgh Agency office of the defendant. Each coupon in the book recited, inter alia, as follows: "See inside back cover as to effect of failure to pay premiums". The provision referred to provided for a default after a 31 day grace period. The policy had a similar provision. For our purposes, it may be said that a default abrogated the accidental death and family income benefits of the policy.

Premiums were paid regularly on a monthly basis until April of 1961 when the insured changed his employment with resultant financial difficulties and premium defaults. On June 7, 1961, the insured paid the past due premiums and the policy was reinstated upon his application through defendant's Pittsburgh office.

When on July 11, 1961 the monthly payment came due, the plaintiff contacted Wenk in Chicago to see if the policy could be kept in force without payment of the premium. On July 18, 1961 Wenk wrote plaintiff a letter first discussing the other policies and then stating:

"On policy #29 128 710 on Charlie [now involved], send me that policy too. I think I can swing it so that I

can keep the stuff in force without your having to pay an additional premium, or in fact, any money for the next year."

Apparently plaintiff sent Wenk the policy and Wenk submitted to Prudential an application to have an automatic premium loan provision endorsed upon the policy. On August 1, 1961, and apparently before defendant acted on the insured's application, Wenk wrote plaintiff as follows:

"Enclosed is the first contract on Kevin which we have corrected. Each policy now has the automatic loan provision included, and if you miss a premium payment, the Company will merely borrow your cash equity to make the payment. The other contracts will follow shortly.

"I am putting automatic premium loan on all of them and then when you and Charlie are in better financial shape, we will try and pay up the difference. I know you are worried about Charlie's life insurance and you can rest assured that I will make certain they will be kept on the books during your rough period of financial adjustment.

"Listen old pal, don't worry about money because I am glad to send you anything you need in the interim. That's what friends are for. * * * "

Shortly thereafter Wenk learned that since the premiums on the policy in issue were payable monthly, the automatic premium loan endorsement could not be added. He testified that he had not theretofore been aware of the change from the annual premium payments to the monthly payments. On August 9, 1961, he wrote plaintiff in pertinent part as follows:

"One idiotic policy is in the Pittsburgh office and was transferred for some * * * reason.

"This is the big one on Charley. Have Charley sign this loan agreement—both copies, and have somebody witness it.

"You cannot witness it, so have some neighbor or someone do it. * * * No one related to you.

"Return it to me immediately in the next mail so I can avoid this thing going off the books. I am going to borrow the cash value from that contract and pay your premium with it. Do not delay in returning this dumb form.

"If there is not enough cash in here to pay the premium, I will have to bill you for the difference."

Plaintiff never returned the loan forms and it is tacitly agreed that neither did anyone else on behalf of the insured. Since the July 11, 1961 premium was not paid the lapse provision became operative on August 11, 1961. Plaintiff received a notice of lapse from defendant dated August 25, 1961.

On November 16, 1961 the insured was accidentally killed. Neither plaintiff nor insured made any attempt to pay any premiums after the June 1961 payment or made any attempt to reinstate the policy.

All of plaintiff's arguments, whether couched in terms of estoppel or otherwise, recognize that part of plaintiff's burden was to offer evidence which would warrant the jury in finding that she or the insured reasonably relied upon representations of defendant's agent Wenk to their detriment. Let us therefore assume without deciding that the jury was entitled to find that Wenk at least had apparent authority to give the assurances which are claimed. We consider then whether, viewing the matter most favorably to plaintiff, there was evidence which could have justified the jury in finding that the plaintiff or the insured reasonably relied upon such assurances.

Plaintiff argues that Wenk gave plaintiff assurance that because of the loan value of the policy, timely payment of the premiums could and would be made from that source. Plaintiff says that Wenk made this statement of fact to plaintiff in the course of the discharge of his duty to the insured and to plaintiff. What was the evidence on this point?

We shall first consider the period between the date of the last payment in June 1961 and the expiration of the

grace period created by the failure to make the July 11 payment, i.e., August 11, 1961. During this period plaintiff admittedly received the letter from Wenk dated July 18, 1961 in response to plaintiff's request to find a way to keep the policy in force without premium payments. This letter itself was clearly not a definite commitment by Wenk, but it was admissible evidence on the reliance issue. The August 1, 1961 Wenk letter referring to the fact that he was "putting automatic premium loan" provisions in all the policies was also admissible evidence on the issue of plaintiff's claimed reasonable reliance. Had the evidence on the reliance issue stopped here it might fairly be said that plaintiff had created a jury issue on this point. But the uncontroverted evidence does not stop with the August 1, 1961 letter.

After learning that the automatic loan endorsement would not be approved Wenk wrote the August 9, 1961 letter (Wednesday) which plaintiff received. The reference in the letter "Return it [the loan agreement] to me immediately in the next mail so I can avoid this thing going off the books" makes it undisputably clear that Wenk was trying to get plaintiff and the insured to sign the loan agreement so that he could use the proceeds to pay the premiums for a time. Had the forms been returned it could perhaps be argued that plaintiff and the insured were justified in continuing to assume that the loan had been obtained and the premiums paid. But they were not returned. Thus, at the time the grace period expired on August 11, 1961, neither the plaintiff nor the insured then had any reasonable basis for a claimed reliance on the fact that Wenk had arranged for the premium payments.

But let us assume that the expiration of the grace period for the payment of the July premium was somehow extended 31 days. Such an extension might be assumed because of plaintiff's reliance during the actual grace period until the receipt of the August 9 letter. This letter destroyed any possible reasonable basis for continued reliance upon Wenk's representations that the premiums had been taken care of through loans against the policy. Such period would have expired on September 10, 1961. What happened in the period between August 10 and September 10? Plaintiff received a lapse notice from defendant dated August 25, 1961. This of course was an important indication that premium payments had not been made by means of loans. Nevertheless, so far as the evidence is concerned, plaintiff and the insured did nothing to remedy the situation.

◼ Thus, for at least 31 days after the date when plaintiff and the insured were clearly on notice that the premium payments could not be handled through loans against the policy, they did nothing to prevent the default provision from becoming operative or to attempt to reinstate the policy. In consequence there was no issue of fact for the jury as to reasonable reliance by plaintiff and the insured.

Because certain correspondence after September 10, 1961 was received in evidence we think it desirable to discuss its effect. Plaintiff states that "any correspondence after that time [August 11, 1961] would only serve to show the continuing activity of the agent on the question of the plaintiff's initial reliance". Thus, plaintiff does not argue the possibility of a reasonable reliance based on later representations which might have misled her and the insured into not seeking reinstatement of the policy. We therefore consider the later correspondence solely as it relates to the original reliance.

On September 12, 1961, Wenk wrote plaintiff in pertinent part:

"I am returning contract #29 128 710, which I believe you are still paying on a monthly basis.

"My advice here, is to keep paying the monthly premiums on this policy until you are in a better financial situation and can afford to take care of it quarterly or semi-annually. Don't let this one lapse now. As long as you keep it

on a monthly basis, we can't put the automatic premium loan provision in here like we can on the other policies."

On October 9, 1961, Wenk wrote the insured. This letter was admitted over defendant's objection that it came after the lapse and could not explain the failure to pay premiums due earlier. We shall assume that it was properly admitted for the purpose noted. We quote the portion of the October letter relating to the policy in question:

"We have managed to save all of your life insurance temporarily—at least for another year or so by using the automatic loan provision to pay the current premiums due.

"This means that Kevin's policy, Marty's policy, and Steven's are still in force along with your Family Income policy that you took out in 1956."

The September 12 letter communicated the assumption that Wenk believed plaintiff was making the monthly payment and he counseled her to continue them. Yet plaintiff was not making the payments and as indicated must be charged with the knowledge by this time that the July, August, and September payments had not been handled through loans.

As noted plaintiff does not contend that the October 9, 1961 letter constituted an independent basis for a finding of reasonable reliance. To the extent plaintiff implies that it was evidence of reliance during the critical period, we must say that it lacks any language which would in any way confirm the reasonableness of a reliance by plaintiff or the insured through the "extended" grace period. This is so because the August 9 letter and the August 25 lapse notice cannot reasonably permit such a conclusion. The September 12 letter reinforces this result.

Wenk blamed his lack of knowledge concerning the fact that the premiums had not been paid on defendant's failure to send him a copy of the lapse notice. He testified that he would have helped plaintiff "save" the policy had he known the premiums were in default. Assuming

this is so and that it helps to explain his October letter, it does not aid plaintiff's cause. We say this because plaintiff's claim is based on estoppel and this alleged failure of defendant did not justify plaintiff or the insured in believing that the premium payments were being loaned.

The undisputed evidence permitted only the conclusion that neither the plaintiff nor the insured had any reasonable basis during the period here deemed critical to assume that the premiums were being loaned. Consequently, there could be no proper evidentiary basis for a jury finding of an estoppel against defendant's right to prove that the policy was in default prior to the insured's death for failure to pay premiums. Such being the case, plaintiff's claim was without merit and defendant's motion for judgment n. o. v. should have been granted. The cause is reversed and remanded with instructions to enter judgment for defendant.